Suott, J. The supposed contempt, for which the name of the defendant in the court below was stricken from the rolls of Washington circuit court, and he, by that court, suspended from the practice of his profession, as an attorney at law and solicitor in chancery, in all courts of the fourth circuit of this State for the space of six months, consisted of the following words, written on a piece of paper, and found sticking on the door of the office of Sebron G. Sneed, the then judge of the circuit court, to wit: “Sebron G. Sneed is a darn’d base and corrupt man,” signed, James P. Neel. Whether this paper was there found during any term of the Washington circuit court, does not appear with entire certainty; all that the transcript shows, on this point, is to be found in the process issued against the defendant below, by which he was “commanded to appear, and show cause, forthwith, why he should not be fined, and his license revoked, for a contempt of the judge of the 4th judicial circuit, now in session, in this: by sticking up at the office door of the judge thereof the following words,” &c. From which it seems that the defendant below was called upon to answer for a contempt of the judge now in session: but whether that supposed contempt had been committed during the term of the court then in progress, or during some previous term, or at some previous period, not in term time, does not fully appear — whether it was committed during the hours of any sitting of the court, or of the judge, when discharging any judicial function, or in the hours of recess, or time of vacation, or whether or not it grew out of, or had any connection whatsoever, either proximate or remote, with the official character, or with the official conduct, of the judge, either as a court or as a judge. The transcript, however, in the answer of the defendant below, which is not contradicted, shows “ that he did not design anything he did as an insult or contempt to the court, as it Avas an out-door affair.” It cannot, therefore, be presumed, against the face of the record, that the paper in question, upon which the charge of contempt was based, had any reference to the official conduct, or to the official character, of Judge Sneed, either as a judge or as a court. Indeed, the silence of the record, upon this essential point, speaks volumes to the contrary) even if the uncontradicted answer of the defendant below be left out of view; for, in case the fact were otherwise, it would be difficult to conceive, when it is remembered that every contempt must necessarily involve official functions, that it would not have appeared on the record, either by the answer of the defendant to interrogatories propounded to him by the court, or otherwise. The question, then, to be determined, is, whether or not the defendant below, in the matter presented by the transcript, was guilty of a contempt cognizable by the court below. And we shall first examine this question in reference to the common law doctrines on this subject, and if it be found that, within the scope of these doctrines,- the defendant below committed no contempt, it will be unnecessary to determine how far these doctrines have been modified by any of the provisions of our constitution, or by the acts of our legislature defining these offences, as both, so far as they affect these doctrines, clearly restrict the field of their operation. Before entering upon the exposition of the legal principles, however, on which these doctrines are based, and by which we have proposed first to test the action of the court below, we may be permitted to remark that we can but feel it a delicate and an odious task to define rules that must necessarily be the measure oí our own powers; nor are we ignorant that, in cases of this kind, our views may expose us, on the one hand, to the imputation of timidity and irresolution, or, on the other, to that of usurpation and tyranny. But to shrink from any question legitimately before us, because of any consequences in which we ourselves may be involved, however directly, would be even more unworthy than the absolute verity of such suggestions. Every occasion of resort to the extraordinary powers of the court should, by all the judges, be carefully avoided; but when proper, aggression should be met in the front with deliberation and firmness: and although the issue .of the contest might prove them naked and powerless, they should pre-* for this to a flimsy panoply, that served them as a defence against tlic weak only, until the strong were pleased to tear it from their shoulders. The right to punish for contempts, in a summary manner, has been long admitted as inherent in all courts of justice and in legislative assemblies, founded upon great principles, which are co-oval, and must be co-existent, with the administration of justice in every country — the power of self-protection. And it is only where this right has been claimed to a greater extent than this, and the foundation sought to be laid for extensive classes of contempts, not legitimately and necessarily sustained by these great principles, that it has been contested. It is a branch of the common law brought from the mother country and sanctioned by our constitution. The discretion involved in the power is necessarily, in a great measure, arbitrary and undefinable, and yet the experience of ages has demonstrated that it is compatible with civil liberty and auxiliary to the purest ends of justice,, and to the proper exercise of the legislative functions, especially when these functions are exerted by a legislative assembly. A luminous writer, and deservedly eminent jurist, (the late Judge Dade, of Yirginia, in the case of The Commonwealth vs. Dandridge, reported in Virginia Cases, 409,) has made the following remarks: “ In this country we know no privileges but such as exist for the public good; many such privileges we haver from those which appertain to the legislature itself even down to such as belong to the lowest executive officer. Those which surround the administration of justice belong to the same order. Courts, their officers, and process, are shielded from invasion and insult, not from any imaginary sanctity in the institutions themselves, or the persons of those who compose them, (as in the political and ecclesiastical establishments of another hemisphere,) but solely for the purpose of giving them due weight and authority, and to enable those who administer them to discharge their functions with impartiality, fidelity and effect. This is the true test of every privilege not granted by statute, and is the spirit of every one (not merely private) which is so secured. The political character of the judiciary, and thettendency of the duties which arc devolved upon it, rendered it necessary to invest it with a considerable share of these privileges. It is confessedly the weakest branch of all governments, wielding neither wealth, force, nor patronage. Its duties consist in adjusting and settling the contested rights of individuals, in controlling their turbulence, and punishing their crimes. These duties are often of a severe and rigorous character, and as they are generally to be discharged in almost immediate contact with those on whom they act, their exercise will frequently elicit the angry passions, or excite unworthy and sinister attempts to bias or avert their operation, and where there is little real power and no patronage a certain degree of external dignity may have been considered necessary to supersede atoo frequent resort to the actual powers of the courts.” In these remarks are to be found the true basis of the whole doctrine of contempts, and of attachments for contempts, as it existed at common law, and has been recognized by some of the ablest American jurists, extending, as it does, not only to acts which directly and openly insult or resist the power of the court or the persons of the judges, but to consequential, indirect and constructive contempts, which obstruct the process, degrade the authority, or contaminate the purity of the court; and every case of authority seen in the books will be found to proceed upon the idea, either remote or proximate, of disrespect to the court, or the judges, in reference to their official character or conduct, or of matter in derogation of the dignity of the courts, or are referable to that power of self-protection which, we have remarked, is necessarily inherent in judicial institutions. Although these doctrines of the common law had their primitive origin in an idea totally unrecognized and without place in this country, and preserved even in England only by a fiction of law, still, in our own free government, it has always been admitted that, to a greater or less degree, they must have place, and here they have been rested on an idea not totally dissimilar to that original one. Anciently, in England, it is known that the king, in person, presided in his courts of justice, and sat himself in judgment, and the insult, resistance, or contamination, was to majesty itself, that hold sway in divine right. In our day we refer it to the majesty of the law. It has never been contended, in this country, that the common law, although it is our birth-right and in force among us without express recognition by our constitution and laws, was ever actually in force in all its length and breadth, but only to an extent that was not wholly inconsistent with those great principles upon which our free institutions, purely American, have been reared and maintained. So these doctrines, which we are considering, in being recognized by the courts, must be regarded as having received a corresponding abatement of those of its lineaments, which are at open war with the nature and character of our constitution, and the actual state of things among us under its legitimate operation, or it would be an exotic that could not germinate in our soil. In 4 Blackstone’s Commentaries, 238, that writer says: “The contempts that are thus punished are either direct, which openly insult or resist the powers of the court or the persons of the judges who preside,” &c.; and at page 285, in enumerating the contempts which degrade the judicial authority, he refers to one which consists “in speaking or writing contemptuously of the courts or judges acting in their official capacity.” It is obvious that in these two clauses the word “judges ” is not used by the writer for the mere purpose of illustrating his meaning in the use of the word “court,” for, besides the consideration that this view is not sustained by the context, such an explanation of his meaning is so altogether futile and useless after his luminous exposition of the courts in his third volume, as not to be attributed to a writer so able and perspicuous. On the contrary, it was’ evidently his purpose, in the first clause, to take the distinction between a disrespect of the constitutional powers of the court, and a personal disrespect of the judges therein sitting; and, in the second, between a contempt of the judges while actually holding a court, and a contempt of the same persons while in discharge of judicial duties appertaining to their official character, though not performed in court. The opposite construction would produce a complete identification of the judges with the court so as to make a contempt of the one or of the other perfectly convertible. From which may be deduced the clear privilege of the persons of the judges, in or out of court, when acting in their judicial capacity; not because of any imaginary sanctity of their persons, nor because that an indignity to their persons, when so engaged, obstructs the course of justice, for it might sometimes be of such a character as not to have that effect, (and besides, in that aspect, it is always referable to another head of contempts: that is, for obstructing the powers of the court,) but because, to use the words of Blackstone, “it demonstrates a gross want of that respect which, when once courts of justice are deprived of, their authority (so necessary for the good of the kingdom) is entirely lost among the people.” Nor, to produce this effect, is it of any importance whether the contumely be used in open court at the moment when the occasion occurs, or the moment afterwards, when the sheriff has proclaimed the adjournment. The only real question in either case is, whether it is the official conduct for which the judge is challenged and insulted. Nor can a reason be offered for the protection of the person of the judge in court, that will not equally apply to a protection out of court on the same account, in view of the remark we have already made, that whenever the indignity in open court would have the effect to interrupt its business, the attachment would be referable to the head of obstructing the powers of the court. An ideal, imaginary being, without form, substance, or locality, needs no protection from penal sanctions. A court separate from the persons who compose it, is of this description. A sensible writer has said that “ the terms nation, State, community, are words only; they do not denote any thing separate from the individual members whose aggregation and association have received these names;” and the like may be affirmed of a court of justice. When, therefore, attachments were sent out against inferior judges and magistrates for contempts in acting unjustly, oppressively, or irregularly in their office, or in disobeying the writs issuing from superior courts to them, such as writs of prohibition, certiorari, mandamus, &c., (Kelle 484. 6 Mod. 90,) or against sheriffs, bailiffs, &c., (2 Hawk. P. C. 151. 2 Burr. 092, 797,) or against witnesses, jurymen, and'parties, (Barnes 30, 32. Stra. 1094,) or against attorneys and other officers of court, (2 Hawk. P. C. 144. Barnes 29, 31,) or on account of any of that large class of contempts which is summed up by Blackstone as “ demonstrating a gross want of that regard and respect which, when once courts of justice are deprived of, their authority (so necessary for the good order of the kingdom) is entirely lost among the people,” (4 Blk. Com. 286,) such as using rude and offensive language in the face of the court, (Cro. Car. 503,) obstinate perverseness or prevarication, breach of the peace, or willful disturbance in court, (3 Inst. 141, 142,) treating with contumely or disrespect the writs, process, rules, and orders of the court, (Stra. 185, 557, 567, 1068,) perverting them to the purpose of malice, extortion, or injustice; speaking or writing contemptuously of the court or judges acting in their official capacity, (4 Black. Com. 285,) printing false accounts, &c., of causes pending in judgment, (2 Atkins, 469,) or for other contempts which seem to consist in the breach of a necessary privilege, noticed by Six' William Blackstone, in the 4th volume of his commentaries, in the following language: “Likewise all those, who are guilty of any injurious treatment to such as are under the immediate protection of a court of justice, are punishable by fine and imprisonment, as if a man assault or threaten his adversary for suing him; a counsellor or attorney, for being employed against him; a juror, for his verdict; or a jailor, or other ministerial officer, for keeping him in custody and properly exercising his duty,” — they (these attachments) were not issued upon the idea that the abstract, ideal, invisible, judicial institution called a court, had been injured, nor, in some cases, (as when they were issued for light and contemptuous words used in reference to the writs, process, rules and orders of the court,) because the efficacy of the writ, process, rule, or order was impaired by such con-tamely: but, for tbe most part, because the public good, as connected with the preservation, in its purity, of the judicial institution, required them, and 'that the authority and dignity of the officers in whom this ideal, invisible being called a court, is realized and personified, was sunk and degraded. And that the impurity of such conduct would deprive these institutions of the aid of public opinion in carrying into effect their ordinances, and render a resort to force in all cases necessary, and thus avert a state of things in which it is not probable that any judicial system could long exist. It will be thus seen, from the partial enumeration of the grounds of contempt which we have made, that the common law not only deemed it necessary to defend the citadel of justice itself from every invasion, that, while it might strike at the purity of the judicial institutions, would assail with no less violence, the frame of society itself; but deemed it also needful to defend even the approaches, out-works, and barriers, of the judicial authority, in order to give the fullest effect to its legitimate acts. And it was, therefore, not only when the course of justice was wilfully and visibly obstructed, that j udicial animadversion was called forth, but in numerous other cases, when it was supposed that the general authority and efficacy of the court was, to some extent, impaired and its dignity lessened, and that, too, in some cases by inferences remote and far-fetched, which cannot be defended but by the consideration that the paramount interest of society requires that the course of public justice should be made to How like a mighty river cleared of every obstruction, permanent or temporary, however slight. When, therefore, the common law deemed it so necessary, for this great purpose, to protect the juror, the witness, the informer, the party, the jailor, the attorney, and other persons, many of whom might never again be called into a court of justice, it was not to be expected that it would fail to cover, with its complete armor, the presiding minister of the law’s majesty, who would be so often exposed to similar trials. Not that any higher personal privileges were arrogated for him, than for the humblest of these, but because it was obvious that the principle, which suggested the protection of these, would, at least to the same extent protect him, if it did not rise with the grade of the officer, and the majesty of the law be more degraded in the person of a higher than a lower officer, entrusted with its administration. To the same source are to be traced the numerous cases that have settled the doctrine that a judge, acting within the scope of his jurisdiction, shall not be called to answer for his judgment except by impeachment, however erroneous, malicious, or even corrupt it may have been. But while the iEgis of the law is so thrown over the judge, it finds no pleasure in him when he proves recreant to the high trust reposed in him, for, in the language of one of its oracles, (Sergeant Hawkins,) “ If a judge will so far forget the honor and dignity of his post as to turn solicitor in a cause which he is to judge, and privately and ex-trajudicially tamper with witnesses, or labor jurors, he hath no reason to complain if he be dealt with according to the capacity to which he so basely degrades himself;” nor does it animadvert upon his “out-door affairs” more than upon those of other citizens, unless these are forced upon him on account of his judicial functions. Finding no difficulty, therefore, in arriving at the conclusion that, within the scope of the common law doctrines, the conduct of the defendant below, as shown to us by the transcript, did not amount to a contempt, it is unnecessary for us to determine how far these doctrines have been modified by any of the provisions of our constitution, or how far these doctrines may be affected by the act of our legislature, designed, as it seems, to restrict the field of their operation, in view of the consideration that some of these doctrines are based on principles claimed as inherent in the courts and as essential for their protection and existence, and that by the constitution the judiciary is made coequal and co-ordinate with the legislature as a branch of the government, as none of these questions legitimately arise in this case, and they are therefore reserved. We will, however, upon the question of the right to a trial by jury, insisted upon in the argument, give it as our opinion that the provisions of our constitution and laws guaranteeing this right, unless waived, do not take away from the courts the power to punish contempts in a summary mode; and that their provisions are to be construed to relate only to those cases, which, by our former laws and customs, had been tried by jury, as held in the case of Hollingsworth & Duane, in Wallis' Reports, 77, 106. The judgment of the court below must be reversed.